**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1145
_____

UNITED STATES OF AMERICA,

Appellant

v.

DOUGLAS KENNEDY
_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 2-06-cr-00028-001)
District Judge: Honorable William J. Martini

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 22, 2012
_____

Before:  RENDELL, FISHER, and CHAGARES,
Circuit Judges.

(Filed: June 15, 2012)

Paul J. Fishman, United States Attorney
Mark E. Coyne, Assistant United States Attorney
John F. Romano, Assistant United States Attorney
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

      Counsel for Appellant


Michael N. Pedicini, Esquire
60 Washington Street
Courthouse Plaza
Morristown, NJ 07960

      Counsel for Appellee

————————

OPINION

————————

CHAGARES, Circuit Judge.

The United States appeals the decision of the District Court to vacate and merge several of Douglas Kennedy's counts of conviction. A jury convicted Kennedy in July 2004 of crimes related to his possession with intent to distribute narcotics and his possession of two handguns. At the initial sentencing, the District Court granted Kennedy's motion for a new trial with respect to four counts of conviction. We reversed on appeal. On our limited remand for "re-sentencing

2

only," the District Court sua sponte found certain counts of conviction multiplicitous and vacated another count on the basis that its own jury charge was plainly erroneous. We will vacate the District Court's judgment, once again reinstate all counts of conviction, and remand for resentencing. Regrettably, we find it necessary to direct the Chief Judge of the United States District Court for the District of New Jersey to reassign this case, and all related matters, to a different district court judge on remand.

I.

A.

In October and November 2004, Drug Enforcement Administration agents discovered a heroin distribution network operating out of a house in Clifton, New Jersey. The agents obtained information from wiretapped cell phone conversations that members of the network intended to make a sale at a Burger King restaurant in Newark, New Jersey on November 6, 2004. At the appointed hour, agents monitoring the Burger King observed two individuals from the Clifton house arrive in a livery cab. A black Cadillac automobile with tinted windows soon pulled into the parking lot. Carrying a red shopping bag with 200 bricks of heroin,[1] a woman exited the livery cab, got into the back seat of the Cadillac, then returned to the cab with a brown bag containing $24,000 in cash. As the vehicles left, agents tracked the Cadillac to a house in Irvington, New Jersey, and watched Kennedy exit from the driver's seat and enter the

---

[1] A "brick" of heroin is 50 single-use envelopes of heroin bundled together. Appendix ("App.") 382-83.

3

house. Parked in the driveway at the Irvington house was a green Lincoln Navigator automobile.

Based in part on these observations, agents obtained a search warrant for the house in Clifton. The search uncovered $72,000 in cash, large quantities of heroin stored in bags that resembled the red shopping bag seen in the Burger King transaction, and equipment used to process and package heroin. Agents also seized a ledger that recorded heroin transactions, and in particular listed the November 6 transaction. Esther Grullon, who was present in the Clifton house at the time of the search, quickly agreed to cooperate with the Government. She admitted that she took part in the Burger King transaction with Kennedy, who, she reported, was the driver of the Cadillac. One week earlier, she revealed, Kennedy and another man met her at the same Burger King to purchase a separate order of 200 bricks of heroin.

Armed with evidence of Kennedy's involvement in the drug ring, agents went to the Irvington residence to conduct surveillance the next morning, November 9, 2004. When they arrived, the black Cadillac was parked in the driveway, but the Lincoln Navigator was gone. Kennedy drove up to the house in the Lincoln some time later. Agents approached him, confirmed that he lived in the Irvington house, and placed him under arrest. They then obtained his consent to search the house, the Cadillac, and the Lincoln. Inside the home they found $8,300 in cash, ammunition, and a bag containing 10 grams of crack cocaine. Over the course of the search, Kennedy admitted that the bag of cocaine was his and that he was paid to transport the red shopping bag in the November 6 Burger King transaction.

Agents seized both vehicles and moved them to a secure location for a search by other agents and a drug-sniffing dog. Hidden under the center console of the Lincoln, they discovered, was a secret compartment containing a loaded handgun and four glassine envelopes with .15 grams of heroin. The brand stamped on the envelopes did not match the brands of heroin sold from the house in Clifton. The search did not uncover weapons or drugs inside the Cadillac. A year later, however, in November 2005, an employee performing routine maintenance on the Cadillac noticed abnormally loose wiring and a suspicious construction of the side panels on the center console. He dislodged one of the panels, exposing a secret compartment that had been overlooked in the first search of the Cadillac. Inside, agents found a second loaded handgun and 41 bricks of heroin. This heroin weighed 103.9 grams and bore a brand stamp that matched a stamp used by Grullon and the other Clifton distributors.

## B.

On January 12, 2006, a federal grand jury returned an indictment charging Kennedy with two counts of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B), 841(b)(1)(C), and 18 U.S.C. § 2, as well as one count of possession of a weapon by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The matter was assigned to an able, hardworking, and respected District Judge of the United States District Court for the District of New Jersey.

At the arraignment, the Assistant United States Attorney ("AUSA") detailed Kennedy's sentencing exposure,

5

but emphasized that the recently uncovered evidence of the second gun and drugs in the Cadillac portended significantly greater exposure. The AUSA stated that if the parties did not reach a plea agreement, the Government planned to seek a superseding indictment charging Kennedy with two violations of 18 U.S.C. § 924(c). If proven, those charges alone would subject Kennedy to a mandatory 30 years in prison, to be served consecutively to any other sentence imposed. See 18 U.S.C. § 924(c)(1)(A)(i) (setting a five-year mandatory minimum for a violation of the statute), (c)(1)(C)(i) (setting a 25-year mandatory minimum for a "second or subsequent conviction" under the statute).

When plea negotiations faltered, the Government sought and obtained a superseding indictment on March 14, 2006 and a second superseding indictment on May 23, 2006. The latter indictment contained eight counts. Count 1 charged that from October 30, 2004 to November 9, 2004, Kennedy conspired with others to distribute and possess with intent to distribute 100 grams or more of a substance containing heroin, in violation of 21 U.S.C. § 846. Count 2, which referred to the heroin found in the Lincoln, charged possession with intent to distribute a quantity of heroin in violation of 21 U.S.C. § 841(a) and (b)(1)(C), and 18 U.S.C. § 2. Count 3 charged possession of a firearm in furtherance of the intended distribution of the heroin discovered in the Lincoln, in violation of 18 U.S.C. §§ 924(c) and 2. Count 4, which referred to the heroin found in the Cadillac, charged possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 841(a) and (b)(1)(B), and 18 U.S.C. § 2. Count 5 charged possession of a firearm in furtherance of the conspiracy (Count 1) and in furtherance of the intended distribution of the heroin discovered in the

6

Cadillac (Count 4), in violation of 18 U.S.C. §§ 924(c) and 2. Count 6, which referred to the cocaine found in the Irvington home, charged possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. § 841(a) and (b)(1)(B), and 18 U.S.C. § 2. Count 7, which referred to the gun found in the Lincoln, charged possession of a weapon by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Count 8, which referred to the gun found in the Cadillac, charged possession of a weapon by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

The District Court held a four-day jury trial. After the close of evidence but before summations, and without the jury present, the court addressed Kennedy and his family present in the courtroom. Explaining that he has "never had this conversation with a defendant before," the Judge warned Kennedy that, if he were to be convicted on all charges, the court will have "absolutely no discretion" and "no choice" but to impose a 40-year sentence. App. 678-79. The Judge walked through the "extremely different" options facing Kennedy: either plead guilty and serve "an appropriate punishment" or risk a verdict that would result in "spending the rest of [his] life in jail and maybe never coming out because [he'd] be an old man." Id. at 679-80. Kennedy elected to proceed with the trial. The next day, on July 28, the jury found him guilty on all counts.

Kennedy's attorney did not seek post-conviction relief or file a notice of appeal within the time allotted by the federal rules. On October 24, 2006, Kennedy filed a pro se motion requesting appointment of new counsel. The District Court granted the motion on November 2, 2006. On November 15, 2007, Kennedy's newly-appointed counsel

moved for a new trial, arguing that the failure to move for a new trial within the period prescribed by the rules was excusable neglect. See Fed. R. Crim. P. 33(b)(2), 45(b)(1)(B). Through the motion, Kennedy contended that he had been denied his Sixth Amendment right to effective assistance of counsel because his trial attorney did not seek suppression of the gun and drugs found in the Cadillac. Moreover, he argued, his conviction was unlawful because the second superseding indictment improperly joined Counts 2 and 3 — both of which involved contraband found in the Lincoln — to the remaining counts, which concerned the Cadillac and the conspiracy. See Fed. R. Crim. P. 8(a). Alternatively, he theorized, the evidence adduced at trial proved the existence of two unrelated conspiracies and thus impermissibly varied from the indictment, which charged a single conspiracy.

On June 5, 2008, before ruling on the motion or proceeding to sentencing, the District Court held a status conference. The Judge told Kennedy that "[o]ne of the only ways that you can release the Court . . . from imposing th[e] mandatory minimum is if you were to be able to provide cooperation to the Government in some form." App. 904. When discussions between Kennedy and the Government bore no fruit, the District Court scheduled sentencing for August 21, 2008, more than two years after the date of conviction.

The court began the August 21 hearing by focusing on the pending motion for a new trial. Over the Government's objection, it found excusable neglect because trial counsel effectively abandoned Kennedy after the conviction. Turning to the merits, the court rejected Kennedy's misjoinder and

8

variance arguments but found the ineffective assistance of counsel claim convincing. Trial counsel's failure to question the validity of Kennedy's consent to the searches and his decision not to seek suppression of the Cadillac gun and drugs on chain-of-custody grounds, the District Court ruled, amounted to constitutionally deficient representation.[2] Finding that counsel's deficiency resulted in prejudicial convictions, the District Court granted Kennedy's motion for a new trial with respect to Counts 1, 4, 5, and 8 — all counts that were premised on the gun and drugs seized from the Cadillac. On the remaining counts of conviction — Counts 2, 3, 6, and 7 — the District Court imposed a 15-year term of incarceration, the minimum sentence authorized by Congress. See 18 U.S.C. § 924(c)(1)(A); 21 U.S.C. § 841(a), (b)(1)(B)(iii) (2006).

Kennedy appealed and the Government cross-appealed. We affirmed the District Court's rejection of Kennedy's misjoinder argument and his effort to attain a new trial on all eight counts. United States v. Kennedy (Kennedy I), 354 F. App'x 632 (3d Cir. Dec. 7, 2009). We held, however, that the District Court made two mistakes of law in its analysis of the ineffective assistance of counsel claim.[3]

---

[2] In reaching this conclusion, the District Court denied the Government's request to obtain testimony from Kennedy's trial counsel to explore his trial strategy.

[3] We also disapproved of the procedure employed by the District Court, reminding the court that claims of ineffective assistance of counsel typically should be asserted in collateral proceedings, not on direct review or in motions for a new trial.

First, it erred in finding Kennedy's trial counsel constitutionally deficient by incorrectly placing upon the Government the burden to show that counsel was effective and by ignoring the possibility that counsel's decision not to mount a chain-of-custody attack was strategic. Second, it neglected to address in its discussion of prejudice whether Kennedy would have prevailed in a motion to suppress the Cadillac evidence. Based on the trial record, we concluded, Kennedy failed to demonstrate ineffective assistance of counsel. We therefore reversed the grant of a new trial on Counts 1, 4, 5, and 8 and remanded "for re-sentencing only." Id. at 639.

The District Court did not immediately set the matter for resentencing after we issued our mandate. Instead, "in anticipation of resentencing," it invited the parties to brief three issues: (1) whether Counts 3 and 5 were multiplicitous; (2) whether it was plain error to use "and/or" language in the jury charge on Count 5; and (3) whether the jury charge was inconsistent with Richardson v. United States, 526 U.S. 813 (1999). App. 1016-17. The Government submitted a sentencing memorandum that argued that only the multiplicity issue could be considered at sentencing; all other issues, it said, fell outside the mandate and were otherwise beyond the court's power to raise on its own initiative. It also disputed the issues on the merits. Kennedy did not submit briefing in anticipation of resentencing and did not file a second motion for a new trial.

The parties convened for resentencing on December 20, 2010. After a lengthy colloquy with the AUSA, the District Court announced that, even though it had not requested briefing on the matter, it would merge Counts 2 and

10

4 (the possession-with-intent-to-distribute counts) into a single count and likewise merge Counts 7 and 8 (the felon-in-possession counts) into a single count. The court explained that these sets of counts, which distinguished between contraband found in the Lincoln and contraband found in the Cadillac, charged Kennedy twice for single, undifferentiated offenses. The court also vacated the jury's verdict on Count 5, the second charge under 18 U.S.C. § 924(c). Having amended the counts of conviction in this way, the District Court resentenced Kennedy to 15 years in prison on the remaining counts. See 18 U.S.C. § 924(c)(1)(A); 21 U.S.C. § 841(a), (b)(1)(B)(iii) (2006).

Three days later, the District Court issued a memorandum opinion that set forth its reasoning. United States v. Kennedy (Kennedy II), Crim. No. 2:06-00028, 2010 WL 5418931 (D.N.J. Dec. 23, 2010). Endeavoring to apply a plain error standard of review, it began with its multiplicity rulings on Counts 7 and 8, the § 922(g)(1) convictions. The court identified as controlling authority United States v. Tann, which held that the allowable unit of prosecution under § 922(g) is the incident of possession and that possession of two firearms "seized at the same time in the same location[] supports only one conviction and sentence under § 922(g)(1)." 577 F.3d 533, 537 (3d Cir. 2009). Because Kennedy's gun in the Cadillac and his gun in the Lincoln "were within eyeshot of one another," the District Court found that Kennedy had simultaneously possessed both firearms. Kennedy II, 2010 WL 5418931, at *4. To remedy the multiplicity, it merged Counts 7 and 8 into Count 7.

The District Court next found that Count 2, which charged possession with intent to distribute under 21 U.S.C. §

11

841(a) for the heroin in the Lincoln, and Count 4, which charged possession with intent to distribute under § 841(a) for the heroin in the Cadillac, also were impermissibly multiplicitous. Punctuating its analysis for emphasis, it reasoned that both stashes of heroin were "seized by the police in a *common* operation working from a *single* surveillance post" and were "seized at the *same* time . . . and at the *same* street address." Id. at *6 (emphases in original). From this, the District Court concluded that Counts 2 and 4 also imposed cumulative punishment. Accordingly, it merged both counts into Count 2.[4]

Having merged Counts 2 and 4 and Counts 7 and 8, the District Court next concluded that it must also merge Counts 3 and 5, the counts brought under § 924(c). As

---

[4] The District Court wrote, "[N]o sentence will be imposed for Count IV in regard to the evidence found in the Cadillac, and Counts II and IV are merged into Count II." Kennedy II, 2010 WL 5418931, at *7. It did not mention that Counts 2 and 4 charged Kennedy under separate penalty subsections of the statute: Count 2 charged Kennedy under 21 U.S.C. § 841(a) and (b)(1)(C), while Count 4 charged Kennedy under 21 U.S.C. § 841(a) and (b)(1)(B). Count 4, the count for the heroin found in the Cadillac, charged Kennedy for a larger quantity of heroin and carried the higher penalty, a mandatory minimum sentence of 10 years, in light of his prior felony drug conviction. 21 U.S.C. § 841(a), (b)(1)(B) (2006). By choosing to merge Counts 2 and 4 into Count 2, the count that charged "a quantity of heroin" and carried no mandatory penalty, the District Court effectively wiped out the jury's finding that Kennedy had possessed with intent to distribute over 100 grams of heroin.

charged and tried, those counts relied on distinct predicate crimes. Count 3, which charged possession of the Lincoln handgun, furthered the intended distribution of the heroin found in the Lincoln (Count 2). And Count 5, which charged possession of the Cadillac handgun, furthered the intended distribution or conspiracy to distribute the heroin found in the Cadillac (Counts 4 and/or 1). Now that Counts 2 and 4 had been merged into a coterminous predicate offense, the District Court reasoned, controlling precedent permitted punishment for only one § 924(c) count. Id. at *8 (citing United States v. Diaz, 592 F.3d 467, 471 (3d Cir. 2010)).

Recognizing that its rationale with regard to Count 5 made sense only insofar as it assumed that the jury believed that Kennedy used the Cadillac handgun in furtherance of Count 4, but not Count 1, the District Court pivoted to consider the propriety of the jury charge on Count 5. It focused on the portion of the instruction that permitted the jury to convict if it found that Kennedy used the Cadillac handgun in furtherance of the conspiracy charged in Count 1 "and/or" the distribution charged in Count 4. This "and/or" language, reasoned the District Court, might have led some jurors to conclude that Kennedy used the Cadillac gun in furtherance of the intended heroin distribution charged in Count 4, while others might have concluded that Kennedy used the Cadillac gun in furtherance of the heroin conspiracy charged in Count 1. Even though the jurors unanimously found Kennedy guilty on Counts 1 and 4 and received a general unanimity instruction, the District Court reasoned, they might not have agreed unanimously on which predicate crime supported Kennedy's conviction in Count 5 because the court did not give a unanimity instruction specific to the count. Analogizing to Richardson v. United States, 526 U.S.

13

813 (1999), a case that did not interpret § 924(c),[5] it held that the predicate crimes in a § 924(c) charge are elements of the crime, and that the "and/or" language of the charge prevented anyone from knowing whether the jury unanimously agreed on the predicate crime. This, the District Court concluded, was not harmless error, and in fact was plain error. To remedy the mistake, the court vacated Kennedy's conviction on Count 5 and declined to impose the 25-year mandatory sentence prescribed by § 924(c)(1)(C)(i).

The Government filed this timely appeal.[6]

---

[5] Richardson involved 21 U.S.C. § 848(a), a statute that forbids individuals from engaging in a "continuing criminal enterprise." To obtain a conviction under the statute, the Government must prove, among other things, that the defendant committed a violation of a federal drug laws that was "part of a continuing series of violations" of federal drug laws. 21 U.S.C. § 848(c)(2). The question was whether the jury must agree unanimously on each violation in the series, or whether the jury need only agree unanimously that the defendant committed a series of violations. Richardson, 526 U.S. at 817-18. The Supreme Court held that each violation in the series is an element of the crime on which the jury must agree unanimously. Id. at 824. The District Court extended the reasoning in Richardson to conclude that a jury must unanimously agree on which offense is the predicate offense in a charge under § 924(c).

[6] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. §§ 3731 and 3742(b).

II.

This is our second encounter with this case. The mandate in our first opinion instructed the District Court, on remand, to conduct "re-sentencing only." Kennedy I, 354 F. App'x at 639. The Government argues that the District Court ignored that directive when it vacated Kennedy's conviction in Count 5. We must agree.

A.

From the earliest days of the republic, and continuing through today, the Supreme Court has "consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court." Briggs v. Pa. R. Co., 334 U.S. 304, 306 (1948) (citing Ex parte Sibbald v. United States, 37 U.S. (12 Pet.) 488 (1838); Boyce's Ex'rs v. Grundy, 34 U.S. (9 Pet.) 275 (1835); The Santa Maria, 23 U.S. (10 Wheat.) 431 (1825); Himely v. Rose, 5 Cranch 313 (1809)); see also 28 U.S.C. § 2106; In re Sanford Fork & Tool Co., 160 U.S. 247, 255 (1895). As the Court explained in Ex parte Sibbald v. United States,

> Whatever was before the court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it upon any matter decided on appeal for error apparent; or intermeddle with it, further than to settle so much as has been remanded.

15

37 U.S. at 492.  The principle, as firmly ingrained as it is fundamental to our hierarchical system of justice, "has remained essentially unchanged in nearly one hundred fifty years." Casey v. Planned Parenthood of Se. Pa., 14 F.3d 848, 857 (3d Cir. 1994).  By now, "[i]t is axiomatic that on remand for further proceedings after [a] decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949 (3d Cir. 1985).  "A trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." Id.

This mandate rule serves important purposes.  It preserves the proper allocation of authority within the tiered federal court structure set up by Congress and the Constitution.  Casey, 14 F.3d at 857; Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1508 (11th Cir. 1987).  It promotes predictability and finality by notifying parties of the matters that remain open on remand and committing the rest to final resolution.  And it safeguards stability in the administration of justice, for the orderly functioning of the judiciary would no doubt crumble if trial judges were free to disregard appellate rulings.  See Litman, 825 F.2d at 1511-12 ("Post mandate maneuvering in the district courts would undermine the authority of appellate courts and create a great deal of uncertainty in the judicial process."); cf. Hutto v. Davis, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no

matter how misguided the judges of those courts may think it to be.").

We must examine whether the District Court adhered to the mandate in our first opinion or whether it ventured beyond its authority.[7] After we remanded for resentencing, the District Court did not consult the mandate or attempt to discern its scope. Before merging counts of conviction and finding error in the jury charge for Count 5, it made a generalized claim of "latitude and discretion" to modify the jury's verdict in the course of resentencing Kennedy. App. 1048. But it gave no explanation as to how those issues were germane to resentencing and declined to grapple with the Government's argument that the mandate curtailed its power to reconsider jury instructions. Had it done so, it could not have avoided the limited scope of the mandate, which directed the District Court to undertake "re-sentencing only." Kennedy I, 354 F. App'x at 639. Our use of the word "only" was not typical, nor was it accidental. Most often, when we find error that necessitates resentencing, we remand for "resentencing," expecting that the district court will attend to resentencing and nothing more. By qualifying our mandate with the term "only," we forewarned the District Court to be especially careful not to consider issues extraneous to resentencing.

The District Court correctly concluded, and the Government conceded, that concerns over multiplicity may be addressed at sentencing. See United States v. Pollen, 978 F.2d 78, 83 (3d Cir. 1992). The Double Jeopardy Clause of the Fifth Amendment "prevent[s] the sentencing court from

---

[7] We review this question de novo. Cooper Distrib. Co. v. Amana Refrigeration, Inc., 180 F.3d 542, 546 (3d Cir. 1999).

17

prescribing greater punishment than the legislature intended." Missouri v. Hunter, 459 U.S. 359, 366 (1983). It is within the power of a sentencing court to construe the unit of prosecution that Congress intended in drafting a criminal statute "'to ensur[e] that the total punishment [does] not exceed that authorized by the legislature.'" Pollen, 978 F.2d at 83 (quoting Jones v. Thomas, 491 U.S. 376, 381 (1989)). In considering whether Counts 7 and 8, 2 and 4, and 3 and 5 were multiplicitous, then, the District Court addressed a matter pertinent to resentencing and within the scope of the mandate.

Reconsideration of the jury charge on Count 5, however, was not a matter germane to resentencing. Jury instructions go to the validity of a conviction, not to the content of the punishment. Confined on remand to conduct "re-sentencing only," the District Court should have turned its attention to fashioning a sentence, consistent with the law, that was tailored to Kennedy and his crimes. The procedure for sentencing is set forth in Federal Rule of Criminal Procedure 32. That rule does not mention reconsideration of jury instructions. We gave district courts additional guidance on the proper sentencing procedure in United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006). That procedure does not permit revisiting the jury instructions sua sponte. The conclusion is inescapable that the District Court, finding error in its jury charge on its own initiative, ventured beyond the scope of our mandate.

B.

The failure of the District Court to abide by our mandate is reason enough to vacate its order with respect to

18

Count 5. Equally troubling, however, is the District Court's failure to consider whether it had legal power to identify and raise the matter sua sponte. By finding its own jury instruction on Count 5 plainly erroneous and vacating Kennedy's conviction, the District Court implicitly ordered a new trial on the count. See, e.g., Neder v. United States, 527 U.S. 1, 15 (1999) ("Reversal [of a conviction] without any consideration of the effect of [an error of omission in a jury instruction] upon the verdict would send the case back for retrial[.]"). That is, although Kennedy did not move for a new trial on Count 5 or choose to brief the matter upon the court's invitation, the District Court nevertheless persisted in granting him a new trial. This decision was contrary to Federal Rule of Criminal Procedure 33, which permits a district court to vacate a judgment and grant a new trial only "[u]pon the defendant's motion." Fed. R. Crim. P. 33; see also Fed. R. Crim. P. 33, advisory comm. notes, 1966 amends. ("[A] judge has no power to order a new trial on his [or her] own motion, [but] can act only in response to a motion timely made by a defendant."); United States v. Wright, 363 F.3d 237, 248 (3d Cir. 2004); United States v. Newman, 456 F.2d 668, 672 (3d Cir. 1972). Because Kennedy made no such motion, the District Court was powerless under the federal rules to assert it on his behalf.

* * * * *

Acting on its own initiative and contrary to our mandate, the District Court maneuvered beyond its authority in vacating the conviction on Count 5 and implicitly granting Kennedy a new trial. Accordingly, we will reinstate the conviction on Count 5.

19

III.

The Government argues that although the question of multiplicity fell within our mandate, the District Court erred in finding Counts 7 and 8, 2 and 4, and 3 and 5 multiplicitous. In each instance, the Government maintains that the District Court misapplied controlling precedent in holding that Kennedy was indicted and convicted twice for conduct that constituted a single offense. Kennedy defends the District Court's authority to address multiplicity, but offers no defense of the court's decisions on the merits.

Multiplicity is the charging of a single offense in separate counts of an indictment. United States v. Carter, 576 F.2d 1061, 1064 (3d Cir. 1978); Charles Alan Wright & Andrew D. Leipold, Federal Practice & Procedure: Criminal § 142 (4th ed. 2008). A multiplicitous indictment risks subjecting a defendant to multiple sentences for the same offense, an obvious violation of the Double Jeopardy Clause's protection against cumulative punishment. See Hunter, 459 U.S. at 366; Pollen, 978 F.2d at 83. The purpose of the constitutional protection against duplicative punishment is "to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." Ohio v. Johnson, 467 U.S. 493, 499 (1984). It is not surprising, then, that the test for multiplicity examines "'whether the legislature intended to make separately punishable the different types of conduct referred to in the various counts.'" United States v. Stanfa, 685 F.2d 85, 87 (3d Cir. 1982) (quoting Carter, 576 F.2d at 1064). In this endeavor, we look to each statute's

"unit of prosecution." Tann, 577 F.3d at 536; United States v. Frankenberry, 696 F.2d 239, 244 (3d Cir. 1982).[8]

A.

The District Court first concluded that Counts 7 and 8, the felon-in-possession convictions under 18 U.S.C. § 922(g)(1), were multiplicitous. Section 922(g) makes it unlawful "for any person . . . who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition[.]" 18 U.S.C. § 922(g)(1). The District Court reasoned that Counts 7 and 8 must be merged because the Cadillac handgun and the Lincoln handgun were "within eyeshot of one another" and were "seized by the *same* group of police in the *same* operation at the *same* time at the *same* street address." Kennedy II, 2010 WL 5418931, at *4-5 (emphases in original).

In United States v. Tann, we held that Congress made the allowable unit of prosecution under § 922(g)(1) the defendant's incident of possession. 577 F.3d at 537. The defendant in Tann was charged with two § 922(g) counts after officers in pursuit apprehended him and placed him under arrest in his bathroom. Id. at 534. The officers recovered ammunition for a handgun on the defendant's person and found the handgun in the bathroom. Id. at 534-35. We held that the seizure of the firearm and ammunition "at the same

---

[8] We review a claim of multiplicity de novo. United States v. Baird, 63 F.3d 1213, 1215 (3d Cir. 1995).

21

time in the same location" supported only one § 922(g)(1) conviction. Id. at 537. In arriving at this conclusion, we relied heavily on United States v. Marino, which held that under a similar felon-in-possession statute, "simultaneous possession of several firearms by a convicted felon constitutes a single offense[.]" 682 F.2d 449, 454 (3d Cir. 1982).

The District Court identified Tann and Marino as controlling but misapplied their reasoning. Both decisions were concerned with the character of the defendant's incident of possession; the conduct of the police at the time of the seizure was inconsequential. The District Court's emphasis on the fact that the same group of police seized both guns in a single operation therefore was mistaken, for neither factor bears on the multiplicity inquiry. What matters is the defendant's "course of . . . treatment of the firearms," which "may not be viewed in a frozen, momentary state immediately prior to the seizure." United States v. Mullins, 698 F.2d 686, 687 (4th Cir. 1983).

The District Court correctly found that both guns were seized at approximately the same time, but it was mistaken in concluding that the guns were possessed in the same location. Like "simultaneous possession," "same location" is an imprecise concept, one whose contours acquire definition by reference to case law. The District Court understood "same location" to mean "same street address," inferring that because the guns were discovered in vehicles parked at the same address, Kennedy possessed them simultaneously. This represents a marked expansion of Tann and collides with myriad decisions of Courts of Appeals outside this circuit that understand the concept of simultaneous possession in the

22

same location more narrowly.  See, e.g., United States v. Verrecchia, 196 F.3d 294, 296, 298 (1st Cir. 1999) (holding that it was appropriate to bring two charges under § 922(g)(1), one for guns seized from defendant's barn and a second for guns seized from defendant's truck that had previously been stored with the guns in the barn); United States v. Keen, 104 F.3d 1111, 1112, 1118 & n.11 (9th Cir. 1996) (holding that simultaneous seizure of a shotgun and ammunition from the same room supports one § 922(g)(1) conviction, but observing that "[g]uns that are acquired at different times or stored in separate places permit separate punishment to be imposed for each violation of § 922(g)"); United States v. Hutching, 75 F.3d 1453, 1460 (10th Cir. 1996) (explaining that "simultaneous possession of multiple firearms generally constitutes only . . . one offense unless there is evidence that the weapons were stored in different places," and finding that firearms stored in the defendant's bedroom, a car in his garage, and his truck could be charged as separate offenses) (quotation marks omitted); United States v. Bonavia, 927 F.2d 565, 569 (11th Cir. 1991) (explaining that "separate possessions can be established by showing . . . that the weapons were stored in different places" and finding counts multiplicitous when the Government presented no such evidence) (quotation marks omitted); United States v. Gann, 732 F.2d 714, 717, 721 (9th Cir. 1984) (holding that multiple charges were permissible when firearms were found in defendant's bedroom closet and car because they were "stored separately").

The evidence adduced at trial showed that Kennedy stored two different firearms in separate vehicles — one in the Cadillac, and a second in the Lincoln.  The firearms were kept in secret compartments that contained heroin branded

with different stamps, suggesting different distributors. The Lincoln gun was in the car with Kennedy upon his arrival at the Irvington residence before his arrest, indicating that the firearms were some distance apart while he was out driving. These facts were enough to show that Kennedy did not simultaneously possess the guns, but rather stored them in separate locations, albeit at times on the premises of the same street address. On these facts, it was proper for the Government to charge separate § 922(g)(1) counts. Kennedy's convictions will not twice punish him for the same offense. The District Court erred in finding otherwise and in merging Counts 7 and 8.

B.

The District Court next held that Counts 2 and 4, the possession-with-intent-to-distribute convictions under 21 U.S.C. § 841(a), also were multiplicitous. Section 841(a) makes it unlawful "for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]" 21 U.S.C. § 841(a)(1). The District Court reasoned that Counts 2 and 4 must be merged because the heroin seized from the Cadillac and the heroin seized from the Lincoln were "seized by the police in a *common* operation working from a *single* surveillance post" and were "seized at the *same* time . . . and at the *same* street address." Kennedy II, 2010 WL 5418931, at \*6 (emphases in original).

We confronted a similar allegation of multiplicitous charges in United States v. Carter. The defendant in Carter was convicted under § 841(a) both of distributing 677 grams of heroin and of possessing with intent to distribute 95 grams

24

of diluted heroin.  576 F.2d at 1063.  He argued that these separate counts constituted a single, undifferentiated offense.  We disagreed, explaining that "Congress . . . intend[ed] that two distinct offenses, punishable by separate sentences, should be seen to arise when the evidence shows — as it did here — that the acts of possession and distribution involved discrete quantities of narcotics[.]"  Id. at 1064.

As with the § 922(g)(1) counts, the District Court mistakenly focused on the conduct of the police when it merged the § 841(a) counts.  It should have discussed the trial testimony that the stash of heroin in the Lincoln and the stash of heroin in the Cadillac had different compositions and purities and bore different brand stamps.  The quantities and means of packaging, too, were distinct:  the Cadillac heroin totaled 103.9 grams and was bundled in bricks, while the Lincoln heroin totaled .15 grams and was packaged only in glassine envelopes.  And, as discussed, the heroin was stored in separate vehicles.  Our reasoning in Carter compels the conclusion that Counts 2 and 4 charged separate offenses and that the District Court erred in merging the convictions.

## C.

Finally, the District Court suggested that it could merge Counts 3 and 5, the § 924(c) counts, because it had previously merged Counts 2 and 4, the predicate drug offenses.  Section 924(c) imposes additional years of imprisonment on "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."  18 U.S.C. § 924(c).  The unit of prosecution for a § 924(c) count, we have held, is the

25

underlying drug trafficking offense. <u>Diaz</u>, 592 F.3d at 474. Because Kennedy was convicted of two distinct possession-with-intent-to-distribute counts, and because the jury properly found that he possessed separate firearms in furtherance of those crimes, his concomitant § 924(c) convictions were not multiplicitous.

*  *  *  *  *

We conclude that Counts 7 and 8, 2 and 4, and 3 and 5 were not multiplicitous and that Kennedy's punishment on those counts comports with the Double Jeopardy Clause. The District Court erred in concluding otherwise and in merging the counts of conviction.

IV.

A.

The Government asks us to direct the Chief Judge of the United States District Court for the District of New Jersey to reassign this case on remand. It also requests reassignment of all related matters, including Kennedy's recent petition for collateral relief under 28 U.S.C. § 2255. The District Court's conduct, argues the Government, demonstrates that its ability to serve as a neutral arbiter might reasonably be questioned and that reassignment is necessary to restore to the proceedings the appearance of impartiality. Kennedy maintains that a reasonable person could not ascribe bias or partiality to the District Court and that reassignment is unwarranted.

Two statutes give us authority to order reassignment. Under 28 U.S.C. § 455(a), a federal judge must self-disqualify from "any proceeding in which [her or] his impartiality might reasonably be questioned." When the judge fails to do so, we may order recusal. United States v. Wecht, 484 F.3d 194, 213 (3d Cir. 2007); United States v. Bertoli, 40 F.3d 1384, 1411 (3d Cir. 1994); Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 167-68 (3d Cir. 1993). Alternatively, we may order reassignment of a judge pursuant to our supervisory powers, as codified in 28 U.S.C. § 2106. Bertoli, 40 F.3d at 1411. Under either statute, reassignment is an exceptional remedy, one that we weigh seriously and order sparingly.

"The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." In re Kensington Int'l Ltd., 368 F.3d 289, 301 (3d Cir. 2003). An objective inquiry, this test is not concerned with the question whether a judge actually harbors bias against a party. Primerica Holdings, 10 F.3d at 162. Because § 455(a) aims not only to protect both the rights of the individual litigants, but also to promote the public's confidence in the judiciary, our analysis focuses on upholding the appearance of justice in our courts. Id.; In re Sch. Asbestos Litig., 977 F.2d 764, 776 (3d Cir. 1992).

The Government submits that a reasonable observer could detect distrust of and disfavor toward the Government in the District Court proceedings. It first points to the Judge's repeated questioning of the propriety of the prosecution. The Judge explained that he believed the Government obtained the second superseding indictment because Kennedy refused

to plead guilty. He castigated the Government for charging Kennedy with two separate counts under § 924(c) after Kennedy declined to cooperate or plead. In the Judge's view, this was an exercise of prosecutorial discretion made in bad faith to punish Kennedy for going to trial. Addressing the prosecutor personally, he stated directly:

> [P]rosecutors . . . do have some discretion which they usually exercise responsibly, reasonably, with some interest in justice and some weighing of what the conduct really is. Okay? By what you did in terms of the Superseding Indictment, you've exposed him now to a 40-year mandatory minimum on very suspicious conduct. . . . And you were the one exercising the discretion when you didn't get a plea to decide, well, now I'll really whack him on the head and I'll bring back two Draconian charges, two 924 charges.

App. 953-54; see also id. at 958 ("That Superseding Indictment was, he didn't plead guilty to the first three counts and therefore if he was going to exercise his right to go to trial, he's going to pay the price because you're going to charge him with Draconian charges. That's the problem I had here.").

Insinuating additional prosecutorial misconduct, the Judge repeatedly characterized the timing of the Government's discovery of the gun and heroin in the Cadillac, one year after the initial search, as "suspicious." See App. 941:17, 942:4, 942:23, 954:6, 954:12, 955:19. Elsewhere, he berated the AUSA and questioned his

28

competence. Early in the initial sentencing hearing, the Judge erroneously placed the burden of demonstrating the effectiveness of Kennedy's trial counsel on the Government, then denied the Government an adjournment so it could prepare. When the Judge faulted the Government for not submitting an affidavit from Kennedy's trial counsel, the AUSA responded that it was not his responsibility to solicit that testimony, for Kennedy bore the burden of proving the claim. The following interaction transpired:

| | |
|---|---|
| Prosecutor: | Well, Judge, beyond that I'm not really sure how we would ever elicit the facts at this point. |
| The Court: | [AUSA], how long have you been an Assistant U.S. Attorney? |
| Prosecutor: | About four and a half years. |
| The Court: | Okay. And how long have you been a lawyer? |
| Prosecutor: | Approximately 15. |
| The Court: | Okay. You're telling me you don't know how you would put forth probative facts on any motion or anything before a judge if they were so probative and important? Is that what you just said? |

App. 927.

Later in the same hearing, the prosecutor stated that 40 years in prison was an appropriate punishment for Kennedy's conduct, an opinion that led to this colloquy:

| | |
|---|---|
| The Court: | I want to hear on the record, I just do. Forget — for this conduct, you in good conscience can go to sleep at night tonight and say this man deserved 40 years mandatory minimum, the rest of his life in jail for this conduct? I want to hear you say that. |
| Prosecutor: | I'm saying that. |
| The Court: | You believe that? |
| Prosecutor: | That is absolutely correct. |
| The Court: | Sit down. Unless you have something more to say that's enlightening to me, you can sit down. |

App. 957. On a separate occasion, the Judge interrupted the AUSA's argument and told him, once again, to "sit down." App. 929:25-930:1. This treatment of the AUSA appears to stand in contrast to the Judge's demeanor at the same hearing toward Kennedy, whom he periodically referred to by his first name, Douglas. See, e.g., App. 933:15, 935:2, 935:3, 935:6, 936:12, 938:7, 938:10.

30

We agree with the Government that, taken together, these interactions cast a pall of distrust over the prosecution's handling of the case. When a judge openly questions the integrity of the Government's evidence collection practices, undermines the professionalism of the prosecutor, and accuses the Government of prosecuting in bad faith — all without evidence of governmental misconduct — a reasonable observer could very well find neutrality wanting in the proceedings.

Other aspects of these proceedings are equally troubling. The Government points out that, at times, the District Court Judge's conduct veered closer to that of a defense attorney than an impartial adjudicator. At trial, he questioned witnesses substantively to clarify matters left unaddressed by defense counsel. App. 327-28. Before the jury rendered its verdict, he urged Kennedy to consider pleading guilty so as to avoid the 40-year mandatory sentence, an entreaty that was arguably problematic in light of the Federal Rules' prohibition on judicial involvement in plea negotiations. See Fed. R. Crim. P. 11(c)(1); United States v. Brown, 595 F.3d 498, 520 (3d Cir. 2010). Before the initial sentencing, he urged Kennedy to cooperate with the Government so as to release the court from its obligation to impose the mandatory sentence. At resentencing, he exhibited a willingness to raise arguments on behalf of Kennedy, even when Kennedy chose not to press those arguments and despite the fact that certain matters were beyond the scope of the mandate and the power of the court to remedy. And throughout the proceedings, he characterized the charges and sentence as "Draconian," "excessive," and "offensive." See, e.g., App. 13, 942:14, 953:12, 953:14,

31

954:17, 954:21, 978:9, 1048:19, 1053:19-20, 1060:2, 1076:12, 1088:7-8.

After considering the totality of these circumstances, we conclude that a reasonable observer, with knowledge of this case, could question the impartiality and neutrality of the proceedings. Accordingly, we will order reassignment of this case and all related matters to a different judge on remand.

B.

We do not make this decision lightly. We recognize that sentencing is one of the most difficult tasks a district court judge must perform, and we have deep respect for the professionalism and seriousness of purpose that judges bring to sentencing proceedings. Sentencing is particularly trying when a judge believes that the punishment mandated by Congress is not a just and proportional sanction for the conduct involved, as may have been the case here. But our Constitution entrusts Congress with the power to define crimes and set punishment for those crimes. Bell v. United States, 349 U.S. 81, 82 (1955). Judges must uphold legislative choices in this regard, made as they are by our elected representatives.

Congress has chosen to require a 25-year mandatory, consecutive sentence for a "second or subsequent conviction" under § 924(c), even when the defendant's prior § 924(c) conviction has not become final. 18 U.S.C. § 924(c)(1)(C)(i); Deal v. United States, 508 U.S. 129, 136 (1993). It did so with full knowledge that the Supreme Court has long accorded prosecutors broad charging discretion. Bordenkircher v. Hayes, 434 U.S. 357, 364-65 (1978); United

32

States v. MacEwan, 445 F.3d 237, 251-52 (3d Cir. 2006); United States v. Esposito, 968 F.2d 300, 306 (3d Cir. 1992). To the extent that the District Court was dissatisfied with this state of affairs, the remedy lies with Congress. See Gore v. United States, 357 U.S. 386, 393 (1958) ("Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility . . . these are peculiarly questions of legislative policy."). In the meantime, it is not for the judiciary to seek to circumvent the language of § 924(c) and the verdict rendered by an impartial jury. We must emphasize, once again: "Ours is a nation of laws, not judges." United States v. Higdon, 638 F.3d 233, 247 (3d Cir. 2011).

## V.

For the reasons stated, we will vacate the judgment and sentence imposed by the District Court; reinstate Kennedy's convictions in Counts 4, 5, and 8; and remand once again for resentencing only. In so doing, we will direct the Chief Judge of the United States District Court for the District of New Jersey to assign this case and all related matters to a different district court judge.